UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVIE NELON,<br><br>Defendants. | Case No. 2:21-cr-00158-RFB-DJA-1<br><br>**ORDER** |

## I. INTRODUCTION

Before the Court is Defendant's Motion to Dismiss or, in the alternative, Motion to Suppress Surveillance Video and Related Testimony (ECF No. 29). Defendant argues that the government's failure to preserve surveillance video footage violated his due process right to present a complete defense. The Court held an evidentiary hearing on this Motion on January 31, 2023. ECF No. 77. The parties also stipulated to certain findings of facts, which the Court granted on February 7, 2023. ECF No. 9. For the reasons stated below, the Court denies the motion in its entirety.

## II. FACTUAL FINDINGS

The Court makes the following factual findings based upon its assessment of the testimony provided at the evidentiary hearing, including credibility, as well as its assessment of the other evidence presented at the hearing, including video recordings of the incident in question.

Mr. Nelon is charged by indictment with prohibited possession of a firearm—a Springfield

XDS .40 caliber semi-automatic handgun—in violation of 18 U.S.C. § 922(g)(1). On October 16, 2020, North Las Vegas Police Detective Marcus Cook walked into Carey Mini Market at approximately 2:47 p.m. to conduct a property check of the store. Detective Cook was conducting a property check because members of the Gerson Park Kingsmen are known to congregate there and Detective Cook had intelligence that there were heightened tensions on that day.

Upon entering the store, he recognized three individuals known to him from prior investigations: the Defendant, Stevie Nelon, as well as Randy Smith and Dymond Pitts. At the time Detective Cook entered the store, Mr. Nelon was bent measuring a substance into a cup that was placed on a scale next to the slot machine. Upon seeing Detective Cook enter the store, Mr. Nelon stepped behind one of the slot machines so that machine blocked Detective Cook's view of him. He reached into the area around his waistband and pulled an object out. He then quickly reached over an individual, later identified as 80-year-old Mr. Namon Reed, who was playing at the slot machine in the corner farthest from the door. Mr. Nelon deposited the object from his waistband onto the shelf on the other side of Mr. Reed.

During this same time, Detective Cook stood at the entrance of the store facing the inside of the store and called for back-up for the purpose of arresting Mr. Pitts as he was aware that Mr. Pitts had an outstanding no bail warrant against him. While Detective Cook was standing at the door, he heard a clink coming from the area of the slot machines where Mr. Nelon was located. However, he could not see what Mr. Nelon was doing because his view was blocked by the slot machines. Shortly after the clink sound was detected, Mr. Nelon then tried to exit the store through the front entrance, but Detective Cook prevented him from leaving. Mr. Nelon then exited through the back door of the store.

Mr. Pitts then also attempted to leave the store and was immediately placed under arrest by Detective Cook's back-up, Detective Costello, due to his outstanding warrant. After Mr. Pitts was in custody, Detective Cook directed other officers in the area to find Mr. Nelon. Detective Cook also walked through the store to see if Mr. Nelon was in the back employee area. However, he was not there. After conducting a search of the back of the store, Detective Cook then began searching the area near the slot machines. Detective Cook found an unspecified amount of marijuana, as well

as a cup on top of a scale. Detective Cook also found 9mm ammunition, 9mm shell casings, and sandwich bags in a hidden compartment in one of the slot machines.

After discovering these items, Detective Cook went to the back of the store to review the store's surveillance videos. Detective Cook reviewed the footage from several minutes prior to his entrance into the store to several minutes after his arrival to the store. After reviewing the video surveillance footage and observing Mr. Nelon reach over Mr. Reed to deposit an object in the area to the left of Mr. Reed, he returned to search the area a second time. During the second search, Detective Costello located a Springfield XDS .40 caliber semi-automatic handgun laying on the shelf directly to the left of where Mr. Reed was seated – the same area where Detective Cook had viewed Mr. Nelon depositing an object on the surveillance camera.

Mr. Nelon was the last person to reach into that area prior to the Officers' location of the handgun. The shelf where the gun was located between two walls and a slot machine. As a result, no one could access the shelf from the back or the sides. The only way to place something on the shelf was by standing in front of it and reaching over the chair or going around the back of the chair for the slot machine where Mr. Reed was sitting. The handgun was the only piece of contraband located on the shelves next to Mr. Reed. The only other items located on the shelf were a couple pieces of debris and a newspaper.

Due to Mr. Reed's position next to the handgun for an extended period of time, Detective Cook asked Mr. Reed if he would voluntarily provide a buccal swab. Mr. Reed consented. Detective Cook did not take swabs from Mr. Smith or Mr. Pitts because he did not observe either of them accessing the shelf area.

Detective Cook did not interview Mr. Nelon on October 16, 2020. Detective Cook did not see Mr. Nelon again for approximately a month when Mr. Nelon was arrested in November 2020 after being pulled over for speeding.

There were sixteen camera angles observing the Cary Mini Market on October 16, 2020. An employee in the store allowed Detective Cook access to view the surveillance footage from all sixteen angles. Three of these angles cover the slot machine area: Cameras 12, 14, and 16. However Cameras 14 and 16's views of the slot machine area are mostly obstructed and do not provide any

additional views of the area where the gun was located that Camera 12 does not already show. At the time of the offense, the Carey Mini Market had a video retention policy of three to six weeks. After this period, any recordings would be overridden. Detectives Cook and Crime Scene Analyst Patrick Fischer knew about this policy. Detective Cook directed Fischer to only retrieve video that covered at least ten minutes prior to Detective Cook's arrival and at least minutes after Cook's arrival. In total, Fischer downloaded approximately twenty-seven minutes of video evidence from Camera 12.

### III.     LEGAL STANDARD

#### a. Failure to Collect Evidence

To establish a due process violation for the government's failure to collect evidence, a defendant must show that the unavailable evidence had an "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" United States v. Zaragoza-Moreira, 780 F.3d 971, 977 (9th Cir. 2015) (quoting California v. Trombetta, 467 U.S. 489 (1984); see Miller v. Vasquez, 868 F.2d 1116, 1120 (9th Cir. 1989). The defendant must also show that the government acted in bad faith in failing to collect the potentially useful evidence. See Miller v. Vasquez, 868 F.2d at 1120 (citing Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988)).

##### i. Exculpatory Value

Under Youngblood, the unavailable evidence must at least be "potentially useful." See Miller, 868 F.2d at 1120. Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." United States v. Zaragoza-Moreira, 780 F.3d 971, 978 (9th Cir. 2015) (quoting Youngblood, 488 U.S. at 57).

///

///

### ii. Bad Faith

As the Ninth Circuit has explained in Cooper and Zaragoza-Moreira, "the bad faith requirement dovetails with the first part of the Trombetta test: that the exculpatory value of the evidence be apparent before its destruction." United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993). Accordingly, "the presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." United States v. Robertson, 895 F.3d 1206, 1211 (9th Cir. 2018) (internal citations omitted). Bad faith "requires more than mere negligence or recklessness." United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011); see also Cunningham v. City of Wenatchee, 345 F.3d 802, 812 (9th Cir. 2003) ("while [the officer's] work may have been negligent or incomplete, it was not conducted in bad faith."). Bad faith also does not exist where the exculpatory value of the evidence is entirely speculative. See Robertson, 895 F.3d at 1212 (collecting cases). Failing to collect evidence despite the officer's knowledge of its usefulness can be sufficient to infer that there was a conscious effort to suppress the evidence. See Zaragoza-Moreira, 780 F.3d at 980.

A review of this circuit's precedents reveals several non-dispositive factors that are commonly considered when determining bad faith. These include, but are not limited to, whether law enforcement was alerted to the value of the evidence, see id. at 979 (finding bad faith where officer was "repeatedly alerted to . . . the potential usefulness of the video"), the officer's knowledge that the evidence would be destroyed, the credibility of the officer's explanation for not collecting the evidence, see Miller, 868 F.2d at 1121, evidence of malice or prejudice towards the defendant, see id., and whether the government acted with deliberateness. See United States v. Flyer, 633 F.3d 911, 916 (9th Cir. 2011) (finding no bad faith where evidence was mishandled rather than intentionally corrupted).

### b. Alternative Sanctions

If the government fails to preserve evidence "under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of

secondary evidence," see Flyer, 633 F.3d at 916, and/or an adverse jury instruction. See Robertson, 895 F.3d at 1213.

In doing so, the court must consider "the quality of the Government's conduct and the degree of prejudice to the accused." Id. at 1213. "The Government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice." Id.

To assess the quality of the government's conduct, the Court must consider "whether the evidence was lost or destroyed while in the government's custody, whether the government acted in disregard of the defendant's interests, whether the government was negligent, whether the prosecuting attorneys were involved, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification." Robertson, 895 F.3d at 1213 (citing United States v. Loud Hawk, 628 F.2d 1139, 1152 (9th Cir. 1979), *overruled on other grounds by* United States v. W.R. Grace, 526 F.3d 499 (9th Cir. 2008)).

In analyzing prejudice, the Court considers "the centrality and importance of the lost evidence to the case, the probative value and reliability of secondary or substitute evidence, the nature and probable weight of inferences and kinds of proof lost to the accused, and the probable effect on the jury from the absence of the evidence." Id. at 1214.

## IV.   DISCUSSION

### a.  Due Process Violation

The Court finds that Detective Cook's decision to obtain and preserve 27 minutes of video surveillance footage from Camera 12 does not constitute a due process violation.

First, the Court does not find that any of the other fifteen camera angles in the store contained potentially exculpatory information. The only two other angles aside from Camera 12 that captured any of the slot machine area are Cameras 14 and 16. However neither of these angles capture the area where the gun was located on the shelves. Viewing footage from these cameras would at most provide duplicative information already captured through Camera 12 because it would identify the individuals who were in the slot machine area at the relevant time; facts already

achieved through viewing Camera 12. But these camera angles would not have provided additional information about who accessed the shelves where the gun was found. See Robertson, 895 F.3d at 1211-12 (finding the exculpatory value of a video footage to be speculative where the angle "offered only a partial view that would not have shown someone gaining access to the trunk . . . .").

Similarly, the Court does not find that the additional surveillance footage from Camera 12 contained potentially exculpatory or useful information. Mr. Nelon was the last person seen reaching into the area to the left of Mr. Reed where the gun was located; the shelf could not be accessed through any other means other than reaching over or behind the chair where Mr. Reed was seated; and the gun was the only piece of contraband found in that location. The only other items located on the shelf were a couple pieces of debris and a newspaper. Therefore, even if earlier footage showed other individuals accessing the shelves, this would still not exculpate Mr. Nelon who was the last person to place any object there.

Moreover, the Court does not find that Detective Cook's actions rise to the level of bad faith in choosing to obtain approximately twenty-seven minutes of video footage. As discussed above, "the presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed . . . ." Cooper, 983 F.2d at 931. Here, the potential usefulness of the earlier video footage was completely speculative. Based upon the testimony as well as the video and photographic evidence submitted at the hearing, Detective Cook had no reason to believe that anyone other than Mr. Nelon or Mr. Reed—the only two individuals who he observed with direct access to the area where the gun was located—placed the handgun on the shelf. Importantly, Mr. Nelon was the only person who reached into this specific area around the same time that Detective Cook heard the "clink" sound. As already noted, Mr. Nelon was also the last person to place something in that area prior to the Officers' search and discovery of the handgun. See United States v. Sivilla, 714 F.3d 1168, 1172 (9th Cir. 2013) (finding government did not act in bad faith in failing to preserve evidence where the exculpatory value "was not obvious"); Cunningham, 345 F.3d at 812 (finding detective's failure to gather potentially exculpatory evidence was not in bad faith where value of evidence was "speculative").

Because the Court does not find that Detective Cook acted in bad faith, the Court does not reach the question as to whether Mr. Nelon "would be unable to obtain comparable evidence by other reasonably available means." Sivilla, 714 F.3d at 1172.

### b. Alternative Sanctions

The Court also does not find, under Loud Hawk, that other sanctions, such as suppression or an adverse jury instruction are warranted. See Loud Hawk, 628 F.2d at 1152.

The Court begins with assessing the quality of the government's conduct. First, the evidence was not lost or destroyed while in the government's custody. Rather it was overwritten through an independent store's routine storage policy. Second, Detective Cook did not act in disregard of Mr. Nelon's interests. Although Mr. Reed never reached toward the shelves during the relevant time period, Detective Cook nonetheless took a DNA sample from Mr. Reed to ensure the gun did not belong to him. Detective Cook also obtained surveillance footage covering a period of thirteen minutes prior to hearing the sound that had tipped him off to the presence of a gun and prior to his entering the store. There is also no evidence of bias or animus against Mr. Nelon or that Detective Cook was not following departmental procedure in his investigation.

Third, although Detective Cook could have retrieved additional video evidence, the Court finds that Detective Cook's actions "fell within a general range of reasonableness." Robertson, 895 F.3d at 1213. As previously noted, there is nothing in the record that would have suggested to Cook that he should preserve any additional period of video footage. Fourth, the prosecuting attorneys were not involved in the decision on what evidence to obtain. See id. 895 F.3d at 1213–14 ("even if the better practice would have been for Agent Longton to request the video sooner, it is significant that neither the OIG agents nor the government attorneys prosecuting the case participated in the events leading to the loss of the evidence.") Fifth, while Detective Cook's actions were deliberate in that he made a conscious choice to select this portion of the video footage, this decision was made based on a reasonable justification as any exculpatory value of additional footage was not apparent (and is still not).

Turning to the second part of the Loud Hawk test, the Court also finds that Mr. Nelon has

not met his burden in showing prejudice. Additional footage beyond which has already been obtained is not central to the case. Footage from Cameras 14 and 16 would have provided duplicative and, in fact, less useful information. At best, additional footage from Camera 12 would have shown another individual reaching into the shelves, but still would not have exculpated Mr. Nelon because he was the last one to deposit an object there before the Officers retrieved the gun. For these same reasons, the nature of the inferences and proof lost to Nelon is not substantial. Finally, the probable effect on the jury from the absence of more video footage is not significantly prejudicial. There were at least four witnesses present near the slot machine during the relevant time period. Mr. Nelon may call these witnesses in support of his defense theory that he did not place the handgun on the shelf. Additionally, Mr. Nelon's counsel can argue during trial both that Detective Cook failed to preserve the video as well as the inferences to be drawn from that failure. See Robertson, 895 F.3d at 1213–14.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss, or in the Alternative, Motion to Suppress Surveillance Video and Related Testimony (ECF No. 29) is **DENIED**.

DATED: December 12, 2023.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**